UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| ATLAS CARBON, LLC | CIVIL ACTION NO. _____ |
|---|---|
| VERSUS | SECTION "_____" |
| MUNTERS CORPORATION | MAGISTRATE "_____" |

## COMPLAINT

**NOW INTO COURT**, through undersigned counsel, comes plaintiff, Atlas Carbon, LLC ("Atlas"), and respectively represents and avers as follows:

### PARTIES, SUBJECT MATTER, AND JURISDICTION

1.

Atlas is a Wyoming limited liability company with its corporate headquarters in the Parish of Orleans, State of Louisiana. The membership of Atlas is comprised of twenty-three residents of Louisiana and four individuals who reside in Wyoming, Georgia, Florida, and Texas, respectively. Accordingly, Atlas is a citizen of the States of Wyoming, Georgia, Florida, Texas, and Louisiana for the purposes of diversity jurisdiction.

2.

Upon information and belief, defendant named herein, Munters Corporation ("Munters"), is a corporation organized under the laws of the State of New York with its principal place of business in the State of Massachusetts and authorized to do and doing business within the State of Louisiana and the jurisdiction of this Honorable Court. Accordingly, Munters is a citizen of the States of New York and Massachusetts for the purposes of diversity jurisdiction.

3.

Jurisdiction of this action is based on 28 USC § 1332(a), as there is complete diversity of citizenship between Atlas and Munters and the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

4.

Venue is proper in this Honorable Court based on the uncontested fact that: (1) the documents that form the basis of the agreement between the parties were negotiated, executed, and/or sent or received within the jurisdiction of this Honorable Court; and (2) and the product that is the subject of this action was purchased within the jurisdiction of this Honorable Court.

## FACTUAL BACKGROUND

5.

Atlas is a new activated carbon manufacturing company. To generalize, Atlas uses a patented technology to produces activated carbon, *i.e.*, carbon that has been heated or otherwise treated to increase its adsorptive capacity, which can be used for water filtration, gas purification, and many other industrial purposes.

6.

In early 2014, Atlas contacted Munters about the potential purchase of a heat exchanger system for use in the carbon activation process at a facility in Gillette, Wyoming.

7.

A heat exchanger system is used during the carbon activation process to reduce the temperature of emission gases for further treatment, as well as recapture waste heat to increase the efficiency of the manufacturing process.

8.

Munters represented to Atlas that it could manufacture a heat exchanger system that would meet the requirements of Atlas's carbon activation process.

9.

Over the course of many months, Atlas and Munters representatives discussed the specifications of the equipment that Atlas needed.

10.

At all pertinent times, Atlas provided and made available to Munters the information it requested to design the heat exchanger system to meet the particular needs for the carbon activation process at the Atlas facility, including, *inter alia*: (a) the location and altitude of the Atlas facility; (b) summer ambient conditions, *i.e.*, the conditions in the most challenging environment; (c) inlet process gas flows, temperatures, and composition, specifically including moisture and particulate loading data; and (d) target outlet gas temperature and composition.

11.

On or about October 20, 2014, Munters provided Atlas with a quote that outlined the proposed specifications of a hybrid heat exchanger that Munters intended to manufacture specifically for use in Atlas's facility and within the parameters that existed given the project data provided by Atlas to Munters ("Quote").

12.

The Quote included specifications for three components of a hybrid heat exchanger, including a tubular heat exchanger called a "Thermo-T," a plate heat exchanger called a "Thermo-Z," and a Transition between the two heat exchangers.

13.

The type, size, orientation, and cooling air requirements of the heat exchanger system were determined and specified by Munters in the Quote.

14.

The Quote states that "Munters warrants products manufactured by it to be free of defects in workmanship and material under normal usage for a period of 12 months from factory documented start-up or 15 months from date of original shipment, whichever occurs first."

15.

On or about December 5, 2014, Atlas issued a purchase order to Munters for the proposed hybrid heat exchanger system ("Purchase Order"). Along with the Purchase Order, Atlas issued a check in an amount equal to 20% of the total price, as required by Munters to begin fabrication.

16.

On or about December 16, 2014, Munters sent an "Order Acknowledgement" to Atlas accepting the Purchase Order, as well as a copy of the Standard Terms and Conditions of Sale.

17.

The Standard Terms and Conditions of Sale were prepared by Munters.

18.

The Standard Terms and Conditions of Sale provide that that hybrid heat exchanger "shall be free from defects and workmanship and materials for the lesser of (i) fifteen (15) months from the date of shipment of the Product by Munters; or (ii) twelve (12) months from the date that such Product becomes operational."

19.

The warranty period for the heat exchanger system remains in effect as of the date of this filing and runs through at least June 30, 2016.

20.

In consideration for the hybrid heat exchanger and all incidental parts and services provided by Munters, Atlas timely paid Munters a total of $315,152.00 (the "Purchase Price").

21.

The hybrid heat exchanger was shipped to the Atlas facility in April 2015 and installed in accordance with the manufacturer's instructions.

22.

The heat exchanger system was put into operation in October 2015. At all pertinent times, the hybrid heat exchanger was operated, maintained, and used in compliance with all instructions and recommendations by Munters.

23.

Atlas began to notice problems with the hybrid heat exchanger in January or February 2016, specifically with the Thermo-Z plate heat exchanger.

24.

Upon closer inspection, the plates in the heat exchanger were warped or distorted and the expansion joints appeared to be damaged.

25.

Atlas promptly notified Munters of the damage, provided photographs to Munters, and requested Munters' assistance in diagnosing the cause of the damage.

26.

On or about February 26, 2016, Munters' regional sales manager acknowledged that the hybrid heat exchanger appeared to be damaged and deformed.

27.

Despite clear evidence of damage to the system, Munters representatives opined that the damage was "mostly aesthetic."

28.

After repeated requests by Atlas, Munters agreed to send someone to inspect the heat exchanger system in person to identify the cause of the damage.

29.

On or about March 11, 2016, Munters sent its consultant and former owner to meet with Atlas and inspect the hybrid heat exchanger.

30.

The consultant confirmed in a report that the Thermo-Z heat exchanger had experienced "structural changes" and had sustained significant damage, including collapsed expansion joints, deformed ducts, cracked welds, and warped plates.

31.

The consultant also stated in his report that the hybrid heat exchanger "appears to operate okay" and made several recommendations to prevent further damage to the heat exchanger system, including different methods of processing air flow, use of a different control system, continuous monitoring of temperature and other conditions, and replacement of the Transition (sold by Munters) with a different transition component.

32.

None of these recommended measures were ever previously raised by Munters at any point during the negotiation, design, purchase, or delivery of the hybrid heat exchanger.

33.

At no time during or after the inspection did the Munters consultant suggest that Atlas had improperly installed the hybrid heat exchanger.

34.

Atlas has determined that the root cause of the damage to the heat exchanger system was excessive condensation.

35.

The cause of the excessive condensation in the hybrid heat exchanger is twofold. The first cause was a thermal load imbalance inherent in the system's design. Munters designed and configured the system so that the tube heat exchanger was not properly balanced with the plate heat exchanger below. The imbalance between the heat exchangers led to condensation of gas during normal operation of the system.

36.

A second cause of the condensation resulted from Munters' failure to advise Atlas that the inlet air temperature needed to be kept at or above 110°F to prevent the temperature of the process gas from going below the 160°F dew point temperature. When the outside cooling air exchanges heat with the process gas, it causes excessive condensation in the plate heat exchanger.

37.

The condensation caused by the factors enumerated above resulted in the build-up of carbon particulate between the plates in the Thermo-Z.

38.

The accumulation of carbon particulate in the plate heat exchanger ultimately led to "plugging" of the system, which further compounded the thermal load imbalance between the heat exchangers, resulting in permanent structural damage to the system.

39.

Atlas Carbon did not design the heat exchanger system and was therefore not aware of the limitations or sensitivity to the issues that caused the damage.

40.

Munters admitted that the design of the system and their operating instructions were defective inasmuch as its consultant and former owner suggested that (a) using heated air along with outside air to hold the temperature constant at or about 110 degrees was required to prevent condensation; (b) the system could be re-oriented or re-configured to further alleviate the condensation and plugging problems; or (c) the Transition united between the top and bottom heat exchangers could be replaced with another unit with different specifications.

41.

Given its knowledge of the potential condensation and plugging problems based on years of prior experience, Munters knew or should have known that the design of the heat exchanger system would result in damage to the system.  The design flaws actually compounded, rather than prevented or reduced, the condensation and plugging problems.

42.

Munters had actual knowledge of the design flaws in the hybrid heat exchanger and withheld this critical information about potential damage until after permanent damage had already occurred. Had Atlas known of the potential damage caused by the condensation, plugging, and associated risks, it would have requested a different design.

43.

The significant damage and deformation of the Thermo-Z plate heat exchanger renders it inoperable for all intents and purposes.

44.

As a whole, the damaged heat exchanger system has a diminished capacity to perform and a significantly shorter service life.

45.

The damaged heat exchanger system has caused Atlas to incur downtime and shortages, substantial disruption of its operations, and a decreased ability to meet its customers' needs.

46.

The use of the heat exchanger system has not only caused damage to the system itself, but has resulted in damage to other equipment and machinery in the facility, widespread disruption of Atlas's operations, and could potentially lead to injury to Atlas's personnel or further damage to its property and equipment.

47.

Due to the damage, the system cannot be retrofitted or rehabilitated in such a way that would restore its capacity and durability to the levels that Atlas bargained and paid for.

48.

Replacement of the Thermo-Z is also not practical, because Atlas would have to employ cost-prohibitive measures and/or extensive modifications to operate the system in the manner in which it was intended. The hybrid heat exchanger manufactured and sold by Munters to Atlas does not meet the requirements for Atlas's operation.

49.

Despite its sole responsibility for the defects inherent in its product, Munters has taken the position that Atlas must pay for the costs to purportedly retrofit or rehabilitate to the hybrid heat exchanger.

50.

Atlas has made amicable demand upon Munters for reimbursement of the Purchase Price of the hybrid heat exchanger.

51.

As of the date of this filing, Munters has not refunded the Purchase Price to Atlas.

52.

In addition to the cost to replace the hybrid heat exchanger, Atlas has sustained additional damages, including, *inter alia*, additional costs and expenses to maintain and operate the system; losses to its productivity; and other damages to be shown at trial of this matter.

## COUNT I – BREACH OF CONTRACT

53.

Atlas incorporates herein all of its allegations made in all prior paragraphs of this Complaint, as if copied herein in extenso.

54.

The Quote, Purchase Order, and Order Acknowledgement constitute a binding contractual agreement between Munters and Atlas.

55.

Munters' failure to deliver a product that satisfied the specifications and requirements for Atlas's intended use constitutes a breach of contract.

56.

Munters' failure to provide adequate written instructions or guidelines for operation of the hybrid heat exchanger constitutes a breach of contract.

57.

Munters' failure to reimburse Atlas for the Purchase Price of the hybrid heat exchanger constitutes a breach of contract.

58.

As a direct and proximate result of the breach of contract by Munters, Atlas has suffered damages and will continue to suffer damages in an amount to be proven at trial in this matter.

59.

Based on the breach of the contract, Atlas is entitled to a recovery of the Purchase Price of the heat exchanger system, any other damages incurred as a result of the defective equipment sold by Munters, and all attorneys' fees and costs incurred by Atlas in this matter.

## COUNT II – BREACH OF WARRANTY

60.

Atlas incorporates all allegations made in all prior paragraphs of this Complaint, as if copied herein in extenso.

61.

Munters warranted that the hybrid heat exchanger would be free from all defects in workmanship and materials.

62.

Munters had actual or constructive knowledge of the conditions and the operating requirements for which the heat exchanger system was intended to be used in Atlas's facility.

63.

Atlas justifiably relied upon Munters' skill and judgment to select and furnish suitable equipment for Atlas's requirements.

64.

Atlas did in fact rely on Munters' skill and judgment to select and furnish suitable equipment for Atlas's requirements.

65.

Munters failed to deliver a product that is fit for its intended purpose inasmuch as the hybrid heat exchanger does not operate correctly under the conditions and the operating requirements of Atlas's facility.

66.

Munters sold Atlas a defective product that failed to perform as expected by Atlas when used in a customary, usual, and reasonably foreseeable manner.

67.

Munters breached its warranty obligation by failing to reimburse Atlas the entire Purchase Price of the system.

68.

As a direct and proximate result of the breach of warranty by Munters, Atlas has suffered damages and will continue to suffer damages in an amount to be proven at trial in this matter.

69.

Based on the breach of the warranty, Atlas is entitled to a recovery of the Purchase Price of the heat exchanger system, any other damages incurred as a result of the defective equipment sold by Munters, and all attorneys' fees and costs incurred by Atlas in this matter.

## COUNT III – NEGLIGENCE

70.

Atlas incorporates all allegations made in all prior paragraphs of this Complaint, as if copied herein in extenso.

71.

Munters is liable for negligence to the extent it designed, manufactured, and sold a system configured in such a way to make it defective for the purpose for which it was intended.

72.

Alternatively, Munters is liable for negligence to the extent it failed to design and manufacture a system that would satisfy the requirements of Atlas's intended use.

73.

Alternatively, Munters is liable for negligence to the extent it constructed, fabricated, manufactured, and/or configured its system improperly or incorrectly.

74.

Alternatively, Munters is liable for negligence to the extent it failed to warn of potential causes of damage to the system.

75.

Alternatively, Munters is liable for negligence to the extent it failed to provide operating instructions, guidelines, or recommendations that would prevent the damage to the system.

76.

Alternatively, Munters is liable for negligence to the extent it failed to inform Atlas that additional measures or modifications would be necessary to operate the system correctly.

77.

As a direct and proximate result of the negligence by Munters, Atlas has suffered damages and will continue to suffer damages in an amount to be proven at trial in this matter.

78.

Based on the negligence of Munters, Atlas is entitled to a recovery of the Purchase Price of the heat exchanger system, any other damages incurred as a result of the defective equipment sold by Munters, and all attorneys' fees and costs incurred by Atlas in this matter.

**WHEREFORE**, plaintiff, Atlas Carbon, LLC, prays that defendant, Munters Corporation, be served with a copy of this Complaint and duly cited to appear and answer same, and that after due delays and proceedings are had, that there be judgment rendered in favor of Atlas Carbon, LLC and against Munters Corporation, for the full amount of the Purchase Price, plus interest from the date of demand; any and all damages sustained by Atlas Carbon, LLC as a result of the breach of contract, breach of warranty, and negligence of Munters Corporation, including any statutory damages and/or penalties, together with reasonable attorneys' fees and all costs of these proceedings; and for any other equitable relief as this Court deems just and proper.

Respectfully submitted:

**KINGSMILL RIESS, L.L.C.**

By: _____
Michael R. C. Riess (#2073)
Michael D. Lane (#30364)
201 St. Charles Avenue, Suite 3300
New Orleans, Louisiana 70170
Telephone: (504) 581-3300
Facsimile: (504) 581-3310
E-mail: mriess@kingsmillriess.com
E-mail: mlane@kingsmillriess.com

*Attorneys for Plaintiff, Atlas Carbon, LLC*

**PLEASE DO NOT SERVE:**

Munters Corporation
Through its registered agent:
Corporation Service Company
501 Louisiana Avenue
Baton Rouge, LA 70802